UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 1:19-cv-4804 |
| BOBBY PEAVLER AND WILLIAM ERIC MEEK, | ) ) ) | |
| Defendants. | ) ) ) | |
| _____ | ) | |

## COMPLAINT

Plaintiff United States Securities and Exchange Commission ("SEC" or "Commission") alleges:

1.     In 2016 and 2017, Defendants Bobby Peavler ("Peavler") and William Eric Meek ("Meek") engaged in a fraud that enabled Celadon Group, Inc. ("Celadon"), an Indiana-based trucking company, to hide tens of millions of dollars in losses attributed to a significant decline in the value of its trucks. Meek, Celadon's then-president and chief operating officer, and Peavler, Celadon's then-chief financial officer, played an active role in the fraud. The fraud involved selling the trucks at inflated prices to cooperative third party truck dealers to mask Celadon's overvaluation of the trucks. Celadon then filed false financial reports for public consumption with the SEC.

2.      The fraud began when Celadon directed its then wholly-owned subsidiary, Quality Companies, LLC ("Quality"), to sell its idle trucks. Meek and Peavler had notice that Celadon listed these trucks on its books for values that were often tens of thousands of dollars above the price at which Quality could actually sell them. So had Quality sold any significant portion of these trucks on the open market, Celadon would have had to record losses on its financial statements, amounting to tens of millions of dollars.

3.      Faced with this prospect, Quality arranged a series of deceptive transactions with two third parties. It sold more than 1,000 trucks to these parties at significantly inflated prices. In exchange, Quality bought different trucks from the same parties at similarly inflated prices. As Meek and Peavler knew, Quality's financial information was consolidated into Celadon's books and records. Celadon used this swap scheme to support the inflated values at which it had Quality's trucks on its books. Celadon falsely reported on its public filings with the SEC that it had assets worth at least $20 million more than it actually did and consequently, reported higher income and earnings than it should have.

4.      Meek directed Danny R. Williams ("Williams"), Quality's then president, to engage in these swap transactions without taking losses. Meek, who was Williams' supervisor at the time, also approved the swap transactions. He further encouraged Williams to do more such transactions.

5.      Peavler and Williams negotiated the largest swap transaction. As

Celadon's then-chief financial officer, Peavler also oversaw the improper accounting that falsely recorded the swaps as independent transactions and valued the trucks on Celadon's books at the inflated amounts.  This rendered inaccurate the financial information in Celadon's public filings signed by Peavler.

6.    Celadon, with Peavler's and Meek's knowledge, then fraudulently transferred the new batch of trucks to an off-book entity at the inflated values.

7.    When Celadon's outside auditor scrutinized the transactions, Meek and Peavler repeatedly lied to hide the fraud. Defendants falsely portrayed the truck swap transactions to Celadon's audit committee and its outside auditor as unlinked purchases and sales at market values. Meek and Peavler knew that they needed to tell such lies in order for Celadon to avoid reporting tens of millions of dollars in losses.

8.    Meek and Peavler also concealed from Celadon's outside auditor a contract governing the largest swap transaction even though Celadon's outside auditor had explicitly requested all documents related to the deals. Peavler also hid from the outside auditor his involvement in negotiating that swap transaction. Meek hid his involvement in directing and approving various swap transactions.

9.    The SEC brings this civil law enforcement action to hold Meek and Peavler accountable for their wrongdoing.

## JURISDICTION AND VENUE

10.     The Commission brings this action pursuant to Section 21 of the Exchange Act [15 U.S.C. § 78u].

11.      This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa].

12.      Venue is proper in this Court pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Acts, practices and courses of business constituting violations alleged herein have occurred within the jurisdiction of the United States District Court for the Southern District of Indiana and elsewhere. Further, Defendants live in the Southern District of Indiana.

13.     Defendants directly and indirectly made use of the means and instrumentalities of interstate commerce and of the mails in connection with the acts, practices, and courses of business alleged herein.

## DEFENDANT

14.     Defendant William Eric Meek, age 39, is a resident of New Palestine, Indiana. During the relevant period, he was Celadon's president and chief operating officer. He resigned from Celadon in April 2017.

15.     Defendant Bobby Peavler, age 40, is a resident of Pendleton, Indiana. During the relevant period, he was Celadon's chief financial officer. He resigned from that position in October 2017, and from the company in March 2018.

## OTHER PARTIES

16.     Celadon is a Delaware corporation with its principal place of business and headquarters in Indianapolis, Indiana. During the relevant period, Celadon's common stock was registered with the SEC and traded on the New York Stock Exchange, which has since delisted Celadon's common stock. Celadon's common stock now trades on the OTC Pink Marketplace.

17.     Quality, an Indiana limited liability company, formerly Quality Equipment Leasing, LLC, was a wholly-owned subsidiary of Celadon during the relevant period.

18.     19th Capital Group, LLC ("19th Capital"), a Delaware limited liability company, was a joint venture between Celadon and another entity ("co-venturer") during the relevant period.

## FACTS

19.     In 2016, Celadon described itself as one of North America's largest truckload freight transportation providers. It offered its customers point-to-point shipping within the United States, between the United States and Mexico, and between the United States and Canada. Celadon provided most of these transportation services through its own fleet of trucks. In 2016 it owned more than 1500 tractor trucks – the front of a "tractor trailer" containing the engine. (In this complaint, tractor trucks are referred to simply as "trucks.")

20.     In approximately 2007, Celadon formed a subsidiary, Quality, which sold and leased trucks that Celadon was no longer using in its operations

to independent truck operators.

21.     In 2016, at Celadon's direction, Quality sought to dispose of idle trucks worth tens of millions of dollars. At the time, the net book values reported on Celadon's financials for many of these trucks—the original purchase prices less depreciation—were well above what Quality could actually command for the trucks on the open market.

22.     Celadon was required under generally accepted accounting principles to value Quality's trucks classified as held for sale assets on its financial statements at their current market value. To avoid doing so, Quality orchestrated a series of swap transactions at inflated prices.

### The Truck Swaps

23.     Here's how the swap transactions worked: Quality found a truck dealer ("Party A") to buy hundreds of Quality's used trucks at higher than market prices. Indeed, in some cases Quality sold the trucks for more than the already inflated book values.

24.     Party A was willing to buy Quality's trucks at inflated prices only if Quality returned the favor by buying Party A's trucks at inflated prices.

25.      Quality and Party A engaged in four such swap deals between June and October of 2016. All told, Quality sold more than 900 trucks to Party A and purchased more than 600 trucks from Party A. Party A calculated that it paid Quality at least $30 million more than Quality's trucks were worth. Further, by selling several of its trucks for more than their net book values,

Celadon managed to fabricate an approximately $1 million gain from the transactions.

26.     In various cases, the value that Celadon was carrying on its accounting records for a truck was ***more than double*** what Quality could have actually commanded for the truck in the open market. Quality thus sold many of its trucks to Party A for prices substantially in excess of their fair value.

27.     The price Quality paid Party A for the newer trucks was similarly inflated – in certain instances by about ***triple*** their fair value. Indeed, in several instances Party A purchased trucks with the express purpose of selling them to Quality. Critically, Party A paid ***a third*** of what it then charged Quality for these trucks.

28.     Meek and Peavler knew that the deals were swap transactions— not independent purchases. Peavler helped negotiate, and Meek helped execute, the last and largest swap transaction with Party A.

29.     In a draft contract to memorialize the last and largest swap deal, the parties freely acknowledged that Quality's truck sales to Party A, on the one hand, and Party A's truck sales to Quality, were "subject to and dependent upon one another."

30.     Peavler reviewed the draft contract. He did not like that it "linked" Quality's sale of trucks to Party A, on the one hand, with Party A's sale of trucks to Quality. Based on Peavler's concern, the contract was revised to eliminate any reference to the linked nature of the purchases. But both sides

knew each purchase remained contingent on the other.

31.     Meek executed the final version of the contract on behalf of Celadon as guarantor. At the time, he knew that Party A's purchase of Quality's trucks was contingent on Quality's purchase of Party A's trucks.

32.     Between August 2016 and February 2017, Quality facilitated similar transactions with another counterparty, known in this complaint as "Party B." In these deals, Quality and Party B swapped more than 300 trucks at inflated prices.

33.     Meek and Peavler knew that Celadon had trucks on its books at inflated values. Defendants were on notice that Celadon's net book values for Quality's trucks exceeded the market values in many cases because they regularly reviewed the trucks' net book values and market values. Meek also monitored pricing in the used truck market.

34.     Moreover, Williams told Meek that Celadon had Quality trucks on its books for above their market values on multiple occasions. When Meek directed Williams in an email in June 2016 to sell more than $70 million of inactive assets, Williams replied: "We aren't in the money on hardly any of the $70M, so we are going to have to lease through it unless we can handle losses?" Nonetheless, Meek thereafter directed Williams to engage in as many swap transactions as he could and not to take any losses.  In September 2016, Williams wrote to Meek in an email: "We aren't having much luck selling the 2015s outright as there are 2015s on the market at $60k and we are at $100k."

Meek replied in part: "Obviously it is a pretty down market now."

35.      Meek and Peavler knew that Quality and Party A sold the trucks at inflated prices in the swap transactions. Furthermore, they were on notice that Quality could not sell hundreds of its used trucks at market prices without taking a loss. Defendants also were aware that Celadon put the trucks purchased from Party A on its books at the inflated purchase prices. Peavler oversaw the improper accounting for the swap transactions.

36.      By failing to recognize at least $20 million in impairment charges on its trucks, Celadon materially overstated the value of its assets and, by extension, materially overstated its income before income taxes, net income and earnings per share in the following public filings, all of which Peavler signed: (a) its Form 8-K announcing its fourth quarter and fiscal year earnings filed on September 2, 2016; (b) its fiscal year 2016 Form 10-K filed on September 13, 2016; (c) its Form 8-K announcing its first quarter earnings filed on November 3, 2016; (d) its Form 10-Q filed on November 9, 2016; (e) its Form 8-K announcing its second quarter earnings filed on February 2, 2017; and (f) its Form 10-Q filed on February 10, 2017.

37.      Celadon's failure to recognize the impairment charges resulted in the company overstating its income before income taxes by at least 149% in its Form 10-K filed on September 13, 2016.

### Straddling the Quarters

38.      Beginning in March 2016, Celadon's financial condition was

precarious. The company had an agreement with its creditors that limited the amount of debt it could carry as a ratio of its earnings before income taxes, depreciation, amortization, and rent/restructuring costs. Celadon had to certify this ratio at the end of each quarter.  In September 2016 Celadon was dangerously close to breaching such debt covenant. Meek and Peavler were aware of this reality.

39.     In order for Celadon to stay below the ratio in its debt covenant at the end of the quarter, Celadon persuaded Party A to pay for the trucks Party A was purchasing in the last and largest swap before September 30, 2016, but to allow Quality to wait until October, when the new quarter began, to make the majority of its payment.

40.     Pursuant to the parties' written contract, Quality agreed to make an initial payment of $5.975 million on September 29, 2016 for the trucks it was purchasing from Party A. As Meek and Peavler were aware, Party A represented that it would only send its $30.47 million wire to purchase Quality's trucks after Party A had confirmed receipt of Quality's initial payment. Meek directed that Quality's initial $5.975 million payment be wired to Party A "first thing" on September 29, 2016 to ensure that Celadon received Party's A's payment before the end of the quarter. After the parties exchanged wires on September 29, 2016, Peavler immediately earmarked Party A's payment of $30.47 million to pay down Celadon's debt before the end of the quarter. Pursuant to the contract, Quality made the remaining approximately $27.9

million payment to Party A on October 3, 2016.

41.     As Meek and Peavler knew, that sleight-of-hand effectively gave Celadon a secret short-term $25 million loan to increase its cash at the end of a reporting period. Of course, all of that cash was spoken for, since Quality was required to repay it to Party A in a matter of days and Celadon had guaranteed that payment. But that short time-lag enabled Celadon to misrepresent its financial condition to the investing public in its Form 10-Q filed on November 9, 2016 by not disclosing the $27.9 million purchase obligation to Party A and by reporting that Celadon was in compliance with its debt covenant. Peavler signed that filing.

42.     Peavler also signed a management representation letter, dated November 9, 2016, to Celadon's outside auditor, in which he made a number of false representations by not disclosing the $27.9 million obligation to Party A. In the letter, Peavler confirmed that Celadon management had made available all significant contracts, and had disclosed any unusual transactions and any large sales with unusual payment terms.  The letter also represented that Celadon's financial statements did not omit any material transactions and that management had not made any commitments as of September 30, 2016 that needed to be disclosed on the Form 10-Q other than those identified in an attachment to the letter.  The attachment to the letter did not identify the obligation to Party A even though Celadon's purchase commitment to Party A was larger than any listed obligation.

**The Joint Venture**

43.     The initial batch of problematic trucks was off Celadon's books. But the company now had a new problem: A *new* batch of trucks for which it had overpaid.

44.     Enter 19th Capital. 19th Capital was a joint venture between Celadon and a co-venturer. Pursuant to that entity's formation documentation, in return for an ownership interest in the concern, Celadon agreed to transfer money and equipment to 19th Capital. To meet this obligation, Celadon contributed many of the trucks it had recently acquired in the truck deals with Party A and Party B.

45.     Meek and Peavler knew that Celadon contributed the swapped trucks to the new joint venture at the inflated prices. By doing so, Celadon avoided recognizing impairment charges.

46.     As a result of contributing the trucks at the inflated values, Celadon materially misstated the value of its purported $100 million investment in 19th Capital in its 8-K announcing the joint venture filed on January 6, 2017, and in its 10-Q filed on February 10, 2017. Peavler signed both filings.

**The Cover-Up**

47.     On December 8, 2016, a business publication published an article in which it alleged a swap of approximately 1,000 trucks between Quality and Party A. The article reported that Celadon did not properly account for the swaps in its financial statements.

48.     Shortly thereafter, Celadon's controller sent Peavler an email and spreadsheet that listed the trucks on Celadon's books. The controller expressed concern that the high prices Quality had paid for many of the trucks, mostly to Party A, would be "hard to argue for."

49.     In response to the article, Celadon's outside auditor began questioning Quality's transactions with Party A. In particular, the auditor sought to determine whether Party A's and Quality's purchases were linked and requested all documents relating to the purchases and sales to Party A including any agreements. Celadon executives denied that the purchases were linked and said that there were no agreements governing the transactions. At the auditor's request, Peavler and Celadon's former chief executive officer signed a representation letter on February 9, 2017 that included the following misrepresentation: "The [Party A] sales and purchases transactions were conducted at arm's length and the prices at which the Company bought and sold vehicles reflect fair market values at the time of the transactions. Each transaction was discreet [*sic*] in nature and none were interdependent. There are no undisclosed side agreements related to these transactions." Peavler knew this was not true when he signed the representation letter. Celadon's auditor relied on the representations in the letter in performing its audit work related to Celadon's Form 10-Q filed on February 10, 2017.

50.     Celadon's controller was the primary point of contact with representatives of Celadon's auditor looking into the purchases with Party A

but the controller relied in part on information from Peavler and Williams initially to explain the transactions. The written communications the controller provided to the auditor in January 2017 and February 2017 contained a number of false statements including that Quality's sales to Party A were at fair market values and not linked to Party A's purchases.

51.     On March 14, 2017, the controller emailed a draft memorandum to Peavler to review before the controller sent it to the auditor the following day. The memorandum falsely stated that: "[a]t no time did Quality and [Party A] agree, explicitly or implicitly, to over pay the other party for their assets in return for selling assets at an overvalued price." The memorandum also falsely stated that there were no oral or written agreements linking the transactions and that Quality did not purposefully sell the trucks to Party A above their fair market values. The memorandum retained these false statements when the controller sent it to Celadon's outside auditor on March 15, 2017.

52.     On March 20, 2017, the controller sent Peavler a revised version of the memorandum that included the same misstatements but added the false justification—proposed by Peavler—that Quality paid more for the trucks because the vehicles were local.

53.     In March 2017, after Celadon's outside auditor continued to question the high prices paid in the transactions with Party A, the controller sought Meek's assistance to persuade Celadon's outside auditor that the prices were justified. On March 23, 2017, the controller sent an email to Meek and

Williams and copied Peavler and wrote that it would be helpful if they would review the attached description of the negotiation process with Party A that the controller had written "based on our discussions" and asked them to "add/edit in your own words additional color on the specific transactions . . . ." The description contained material inaccuracies about the truck transactions, including that the parties independently determined the truck values and that the transactions were not linked. It also asserted that "[a]t no time did Quality and [Party A] agree, explicitly or implicitly, to over pay the other party for their assets in return for selling assets at an overvalued price." Despite Meek's knowledge that these representations were false, Meek wrote to Peavler that he read the revised memorandum and that it looked "pretty good." Meek also wrote that he would follow up if he "thought of anything to enhance [it]."

54.     Celadon's board of directors and representatives of Celadon's outside auditor agreed that Celadon's executive team including Meek and Peavler would give a presentation to further explain the transactions with Party A and Party B. On March 30, 2017, Quality's then chief financial officer sent an outline of the presentation to Peavler, Meek and other Celadon executives and asked them "if there is any information [in the outline] you'd like to remove, add, or change." The outline made the false assertion that the "[e]quipment and pricing was evaluated independently by either party" in the transactions with Party A. Peavler replied by email in part that the outline "looks really good" and asked to meet to go over his comments and questions.

55.     On March 31, 2017, Quality's then chief financial officer sent a revised outline for the presentation to Peavler, Meek and others and asked them if they had any questions, comments or changes. The revised outline again falsely stated that in the transactions with Party A, the "[e]quipment and pricing was evaluated independently by either party." A few days later, they received a draft of the PowerPoint presentation to be given to Celadon's outside auditor which included a slide with the same misstatement.

56.     On April 5, 2017, Meek and Peavler and other Celadon executives participated in the planned presentation to Celadon's board of directors and representatives of Celadon's outside auditor at Celadon's headquarters. Quality's then chief financial officer led the presentation but Meek provided much of the commentary. As part of the presentation, Celadon executives showed the slide that falsely stated that "[e]quipment and pricing was evaluated independently by either party" in the transactions with Party A.

57.     During the meeting, Celadon's outside auditor representatives specifically asked again for any agreements related to the transactions. Neither Meek nor Peavler disclosed the existence of the written agreement governing the largest swap transaction. Instead, Defendants falsely conveyed to the outside auditor that they were unaware of any agreements related to the transactions. Celadon's outside auditor representatives also asked whether Quality intentionally scheduled any of the sales before the end of a quarter. None of the Celadon executives revealed that they intentionally sold trucks to

Party A just before the end of a quarter as part of the largest swap deal to allow Celadon to meet its debt covenant.

58.     When representatives from Celadon's outside auditor asked whether any Celadon executives reviewed or approved the deals with Party A, Peavler hid his involvement in negotiating the largest swap deal; and Meek hid his involvement in approving the swap deals. The Celadon executives at the meeting continued to falsely represent to Celadon's auditor representatives that the prices in the transactions with Party A were not inflated.

59.     On April 15, 2017, Peavler sent by email another memorandum to Celadon's outside auditor.  In referring to the transactions with Party A, the memorandum from Quality's management falsely stated that "[t]he equipment and pricing was determined and evaluated independently by each party for all transactions." The memorandum made the same false claim regarding the transactions with Party B. Peavler also attached to the email a copy of the presentation from the April 5, 2017 meeting that included the false statement that the pricing in the transactions with Party A was evaluated independently.

60.     On April 18, 2017, Celadon's controller emailed a draft of another memorandum intended for Celadon's outside auditor to Peavler and the head of Celadon's audit committee, who forwarded it to Meek the next day. The memorandum repeated the lie that "[a]t no time did Quality and [Party A] agree, explicitly or implicitly, to over pay the other party for their assets in return for selling assets at an overvalued price." It also falsely stated that the

equipment was sold and purchased at fair market value in the transactions with Party A and that "none of the equipment values of the purchases and sales were linked to one another . . . ."  Further, the memorandum stated that "[b]oth parties independently evaluated equipment for fair values and transacted each as independent sales and purchases . . . ." The controller sent the memorandum to Celadon's outside auditor by email on April 20, 2017 with the lies retained. The same email attached another memorandum that retained the false justification provided by Peavler that because the trucks were local, Quality was willing to pay a higher price for them.

61.     Peavler encouraged Williams to delete emails in order to conceal the scheme from Celadons's auditor.

62.     On April 25, 2017, Celadon's outside auditor withdrew its previously issued reports on Celadon's financial statements for the fiscal year ending June 30, 2016, and for the first two fiscal quarters of 2017 because Celadon failed to provide support for the prices it paid in Quality's transactions with Party A and Party B. Celadon subsequently announced its intention to restate those financial statements. To date, it has not done so.

**COUNT I**

**FRAUDULENT MISREPRESENTATIONS AND OMISSIONS**

**(In Violation of Section 10(b)**
**and Rule 10b-5(b) of the Exchange Act)**

**(Peavler)**

63.     Paragraphs 1 through 62 are realleged and incorporated by reference.

64.     By virtue of the conduct alleged herein, Peavler violated Section 10(b) of the Exchange Act and Rule 10b-5(b) by making several material misstatements and omissions of material fact that made Celadon's quarterly and periodic reports for the periods ending between June 2016 and December 2016 misleading. As a signatory of these SEC filings, Peavler was a maker of the misstatements and omissions contained therein.

65.     In connection with the purchase and sale of securities, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, Peavler directly and indirectly made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

66.     Celadon's misstatements were material because investors would have considered significant overstatement of Celadon's income before income taxes, net income, and earnings per share and investment in a joint venture and

Celadon's compliance with its debt covenant to be important in their decision to invest.

67.     In the course of engaging in the conduct described herein, Peavler acted knowingly or with a reckless disregard for the truth.

68.     By reason of the foregoing, Peavler violated, and unless enjoined will likely again violate, Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule l0b-5 [17 C.F.R. § 240.10b-5] thereunder.

## COUNT II

### FRAUDULENT SCHEME

**(In Violation of Section 10(b)
and Rules 10b-5(a) and (c) of the Exchange Act)**

**(Meek and Peavler)**

69.     Paragraphs 1 through 62 are realleged and incorporated by reference.

70.     By virtue of the conduct alleged herein, Meek and Peavler, directly or indirectly, singly or in concert with others, by use of the means or instrumentalities of interstate commerce, or by the use of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities, knowingly or recklessly, have employed devices, schemes and artifices to defraud; and have engaged in acts, practices and courses of business which operated or would have operated as a fraud or deceit upon purchasers of securities and upon other persons.

71.     Among other misconduct, Meek directed and approved Quality's purchase and sale of trucks at inflated prices between June 2016 and October 2016 in an effort to avoid taking impairment charges and to present a false depiction of Celadon's financial condition. Meek also signed a guarantee to facilitate the largest of the swap transactions—a guarantee that enabled Celadon to meet its debt covenant. Meek furthered the scheme by not disclosing the existence of the contract to Celadon's auditor. He also lied to Celadon's auditor, misrepresenting that the purchases between the parties were not linked, and that the trucks were sold at arm's-length values.

72.     Peavler negotiated the largest swap transaction, in which Quality sold trucks at inflated prices and purchased trucks at similarly inflated prices. In furtherance of the fraud, he directed the deletion of material terms from the contract governing that swap to conceal the linkage between the parties' truck sales. He also deliberately hid that contract from the auditor, as well as relevant emails and other information about the underlying transactions. Further, he misrepresented to Celadon's outside auditor both that the purchases between the parties were not linked, and that the trucks were sold at arm's-length values.

73.     In engaging in the conduct described herein, Meek and Peavler acted knowingly or with a reckless disregard for the truth.

74.     By reason of the foregoing, Meek and Peavler violated, and unless enjoined will likely again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule l0b-5(a) and (c) [17 C.F.R. § 240.10b-5(a), (c)] thereunder.

## COUNT III

### AIDING AND ABETTING FRAUD

**(In Violation of Section 10(b) and Rule 10b-5
and Section 20(e) of the Exchange Act)**

**(Meek and Peavler)**

75.     Paragraphs 1 through 74 are realleged and incorporated by reference.

76.     By virtue of the conduct alleged herein, Celadon, Peavler and Williams committed primary violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) by knowingly or recklessly, employing devices, schemes and artifices to defraud; and engaging in acts, practices and courses of business which operated or would have operated as a fraud or deceit upon purchasers of securities and upon other persons, by engaging in a series of truck transactions at inflated prices and lying to Celadon's outside auditor about the linked nature of the transactions.

77.     By virtue of the conduct alleged herein, Celadon and Peavler committed primary violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) by directly and indirectly making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in Celadon's quarterly and periodic reports for the periods ending between June 2016 and December 2016.

78.     Among other misconduct, Meek knowingly enabled Celadon's, Peavler's and Williams' fraud by directing and approving the truck swaps at inflated prices, executing the guarantee that related to the largest swap transaction that enabled Celadon to meet its debt covenant, and concealing the contract as well as the linked nature of the purchases and sales from Celadon's auditor. These actions enabled the company to avoid recording impairment charges and to overstate its financial health in its public filings. Unless enjoined, Meek will likely again aid and abet violations of these provisions.

79.     Among other misconduct, Peavler knowingly enabled Celadon's fraud by negotiating the largest swap transaction, overseeing the improper accounting that falsely recorded the swaps as independent transactions and valued the trucks on Celadon's books at the inflated amounts, signing the public filings and signing the representation letters that included false information and/or omitted key information.  These actions enabled the company to avoid recording impairment charges and to overstate its financial health in its public filings.  Unless enjoined, Peavler will likely again aid and abet violations of these provisions.

80.     By reason of the foregoing and pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Meek aided and abetted, and is therefore liable for, the primary violations committed by Celadon, Williams and Peavler of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule l0b-5 thereunder [17 C.F.R. § 240.10b-5], because Meek knowingly or recklessly

provided substantial assistance to Celadon's, Peavler's and Williams' violations of these provisions.  Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Peavler aided and abetted, and is therefore liable for, the primary violations committed by Celadon of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule l0b-5 thereunder [17 C.F.R. § 240.10b-5], because Peavler knowingly or recklessly provided substantial assistance to Celadon's violations of these provisions.

## COUNT IV

## CONTROL PERSON

### (In Violation of Section 20(a) of the Exchange Act)

### (Meek)

81.    Paragraphs 1 through 62 and 69 through 74 are realleged and incorporated by reference as though fully set forth herein.

82.    By virtue of the conduct alleged herein, Williams violated Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

83.    Through his position and responsibilities, Meek exercised general control over Williams.

84.    Through his position and responsibilities, Meek possessed the power or ability to control the specific transactions and activities upon which Williams' violations of Section 10(b) of the Exchange Act and Rule 10b-5

thereunder are based.

85.     Meek knowingly or recklessly, directly or indirectly, induced Williams' acts constituting violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

86.     Pursuant to Section 20(a) of the Exchange Act, [15 U.S.C. §78t(a)], Meek is liable for Williams' violations.

## COUNT V

### AIDING AND ABETTING
### CELADON'S REPORTING VIOLATIONS

**(In Violation of Section 20(e), 13(a) and Rules 12b-20, 13a-1, 13a-11, and 13a-13 of the Exchange Act)**

**(Meek and Peavler)**

87.     Paragraphs 1 through 62 are realleged and incorporated by reference.

88.     Celadon violated Section 13(a) of the Exchange Act and Exchange Act Rules 13a-1,13a-11, and 13a-13 by inaccurately reporting its income before income taxes, net income and earnings per share in its Form 10-K on September 13, 2016; its Form 10-Q filed on November 9, 2016; and its Form 10-Q filed on February 10, 2017.

89.     As alleged above, the inaccuracies concerned: (a) Celadon fraudulently selling and buying overpriced trucks; (b) Celadon not recording the trucks at their fair values; and (c) Celadon failing to take impairment charges.

Additionally, Celadon misstated the value of its investment in 19th Capital. This misconduct caused Celadon to misstate its key financial metrics by significant amounts for the impacted periods.

90.     Additionally, Celadon violated Section 13(a) of the Exchange Act and Rule 12b-20 by omitting Celadon's $27.9 million purchase obligation from its Form 10-Q filed on November 9, 2016.

91.     By virtue of the conduct alleged herein, Meek and Peavler aided and abetted Celadon's reporting violations because they knew about Celadon's failure to take impairment charges, its outstanding purchase obligation in September of 2016, and that Celadon contributed trucks to 19th Capital at inflated prices. Meek and Peavler recognized, or were reckless in not recognizing, that these actions would result in inaccuracies in Celadon's financial statements. By hiding the fact that the parties' truck purchases were intrinsically linked and by negotiating, approving and executing the largest swap transaction, Meek and Peavler substantially assisted Celadon's violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)], and Rules 12b-20, 13a-1, 13a-11, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13] thereunder.

92.     By reason of the foregoing, Peavler and Meek aided and abetted the violations described above and, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Defendants are liable for such violations.

## COUNT VI

## AIDING AND ABETTING CELADON'S
## RECORD-KEEPING VIOLATIONS

**(In Violation of Sections 20(e) and 13(b)(2)(A) of the Exchange Act)**

**(Meek and Peavler)**

93.     Paragraphs 1 through 62 are realleged and incorporated by reference.

94.     Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)] requires issuers registered with the Commission to make and keep accurate books, records and accounts that fairly reflect the transactions and dispositions of the assets of the issuer.

95.     Celadon violated Section 13(b)(2)(A) because its records repeatedly reflected inaccurate transactions and dispositions of assets as a result of the swap transactions.

96.     As set forth above, Peavler knowingly or recklessly provided substantial assistance to Celadon by knowingly or recklessly effectuating an improper truck swap at the inflated prices and by overseeing the improper accounting thereof, as set forth above.

97.     As set forth above, Meek knowingly or recklessly provided substantial assistance to Celadon by knowingly or recklessly directing and approving the improper truck transactions at inflated prices as set forth above.

98.     By reason of the foregoing, Peavler and Meek aided and abetted

the violations described above and pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], are liable for such violations.

## COUNT VII

## FALSE STATEMENTS TO ACCOUNTANTS

### (In Violation of Rule 13b2-2 of the Exchange Act)

### (Meek and Peavler)

99.     Paragraphs 1 through 62 are realleged and incorporated by reference.

100.     Rule 13b2-2 under the Exchange Act prohibits directors and officers from directly or indirectly making or causing to be made materially false or misleading statements or omitting to state, or caused others to omit to state, material facts necessary to make statements made not misleading to accountants in connection with their audit, review, examination or preparation of financial statements or filings with the Commission.

101.     Meek falsely asserted to Celadon's outside auditor that the transactions with Party A were independently negotiated transactions at arm's-length prices and provided inaccurate information to Celadon's controller. He also failed to disclose to Celadon's outside auditor the existence of the contract governing the largest swap deal and his role in reviewing the other swap deals.

102.     Peavler provided false management representation letters to Celadon's outside auditor.  He also falsely asserted to Celadon's outside auditor

that the transactions with Party A were independently negotiated transactions at arm's-length prices and provided inaccurate information to Celadon's controller. He also failed to disclose to Celadon's outside auditor the existence of the contract governing the largest swap deal and his role in negotiating that deal.

103.     By reason of the foregoing, Meek and Peavler violated Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2].

## COUNT VIII

## CERTIFICATION VIOLATIONS

### (In Violation of Rule 13a-14 of the Exchange Act)

### (Peavler)

104.     Paragraphs 1 through 62 are realleged and incorporated by reference as though fully set forth herein.

105.     By virtue of the conduct alleged herein, Peavler violated Rule 13a-14 of the Exchange Act by signing the certifications for Celadon's public filings, including its fiscal year 2016 Form 10-K filed on September 13, 2016; its Form 10-Q filed on November 9, 2016; and its Form 10-Q filed on February 10, 2017, notwithstanding his knowledge that they each misstated Celadon's assets, net income and income per share because they failed to reflect necessary impairment charges.  Further, the Form 10-Q filed on November 9, 2016 did not disclose Celadon's $27.9 million purchase obligation, and the Form 10-Q

filed on February 10, 2017 overstated the value of Celadon's investment in 19th Capital.

106.    By reason of the foregoing, Peavler violated Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14].

## RELIEF REQUESTED

**WHEREFORE,** the Commission respectfully requests that this Court:

### I.

Issue findings of fact and conclusions of law that Defendants Bobby Peavler and William Eric Meek committed the violations charged and alleged herein.

### II.

Enter an Order of Permanent Injunction restraining and enjoining Defendant William Eric Meek, his officers, agents, servants, employees, attorneys and those persons in active concert or participation with him who receive actual notice of the Order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Section 10(b), Section 13(a), Section 13(b)(2)(A), and Section 20(a) and Section 20(e) of the Exchange Act [15 U.S.C. §§ 78t(a), 78j, 78m(a), 78m(b)(2)(A), 78t(e)] and Rules 10b-5, 12b-20, 13a-1,13a-11, 13a-13, and 13b2-2 [17 CFR §§ 240.10b-5, 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13, 240.13a-14 and 240.13b2-2] thereunder.

**III.**

Enter an Order of Permanent Injunction restraining and enjoining Defendant Bobby Peavler, his officers, agents, servants, employees, attorneys and those persons in active concert or participation with him who receive actual notice of the Order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Section 10(b), Section 13(a), Section 13(b)(2)(A), and Section 20(a) and Section 20(e) of the Exchange Act [15 U.S.C. §§ 78t(a), 78j, 78m(a), 78m(b)(2)(A), 78t(e)] and Rules 10b-5, 12b-20, 13a-1,13a-11, 13a-13, 13a-14, and 13b2-2 [17 CFR §§ 240.10b-5, 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13, 240.13a-14 and 240.13b2-2] thereunder.

**IV.**

Issue an order imposing upon Defendants Meek and/or Peavler an appropriate civil penalty pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

**V.**

Pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], issue an order prohibiting Meek and/or Peavler from acting as an officer or director of any issuer that either has a class of securities registered under the Exchange Act, or that is required to file reports pursuant to the Exchange Act.

## VI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VII.

Grant such other relief as this Court deems appropriate.

**UNITED STATES SECURITIES
AND EXCHANGE COMMISSION**

By: /s/ Jonathan S. Polish
Jonathan S. Polish
Amy S. Cotter
Jaclyn J. Janssen
Attorneys for Plaintiff
**U.S. SECURITIES AND
EXCHANGE COMMISSION**
175 West Jackson Blvd., Suite 1450
Chicago, IL 60604
Telephone: (312) 353-7390

Dated: December 5, 2019